IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GEOVERA SPECIALTY INSURANCE.  )
COMPANY,                       )
                               )
    Plaintiff,                 )
                               )
v.                             )  CIVIL ACTION 24-0450-WS-B
                               )
DNB INVESTMENTS LLC,           )
                               )
    Defendant.                 )

## ORDER

This matter is before the Court on the defendant's motion for summary judgment and the plaintiff's motion for partial summary judgment. (Docs. 41, 42). The parties have submitted briefs and evidentiary materials in support of their respective positions, (Docs. 1, 41-42, 47-50),[1] and the motions are ripe for resolution. After careful consideration, the Court concludes that both motions are due to be denied in full.

## BACKGROUND

According to the complaint, (Doc. 1), the defendant was the insured under a homeowner's policy ("the Policy") issued by the plaintiff. After the defendant reported a loss ("the Loss") at the insured house ("the Property"), the plaintiff paid the entirety of the contractors' estimates, less the deductible. Months later, the defendant demanded an appraisal. The plaintiff responded by requesting an examination under oath ("EUO") first. The parties agreed to a date for the EUO, but the defendant then insisted on first initiating the appraisal process by naming appraisers, who would then name an umpire. The plaintiff declined, and the EUO did not occur. The defendant approached a state judge and obtained, *ex parte*, a letter/order naming an umpire.

---

[1] The plaintiff incorporates into its motion the exhibits it attached to the complaint. (Doc. 42 at 2-3).

In response to the letter/order, the plaintiff filed a complaint in federal court, seeking a declaration that it owed no duty to participate in an appraisal prior to an EUO. The defendant moved to dismiss for lack of the requisite amount in controversy, relying on its demand letter seeking payment below that amount. Judge Beaverstock granted the motion to dismiss. The plaintiff responded by naming an appraiser. The defendant had already named an appraiser, and the state judge had named the umpire. The appraisal was conducted in November 2024, and an appraisal award ("the Award") issued the same day, in an amount exceeding that stated in the demand letter.

The complaint consists of three counts. Count I seeks a declaration: (a) that the defendant's letter to the state judge was procedurally deficient; (b) that the defendant failed to establish that the parties were unable to agree on an umpire, and that the defendant improperly asserted otherwise via *ex parte* communication with the state judge; (c) that the state judge had no jurisdiction over the appraisal claim at the time he issued his order; and (d) that the plaintiff has no duty to pay the appraisal award because: (i) it was induced by fraud; (ii) the process was procedurally deficient; and (iii) the defendant failed to satisfy the condition precedent of an EUO.

Count II alleges that the defendant made material misrepresentations before Judge Beaverstock that induced the plaintiff into participating in a sham appraisal, such that the Award was induced by fraud. The plaintiff seeks both compensatory and punitive damages.

Count III alleges violations of the Alabama Litigation Accountability Act ("the Act"), based on the same representations made in the previous federal lawsuit. Count III also mentions Rule 11. The plaintiff seeks to recover costs and attorney's fees.

The plaintiff seeks summary judgment with respect to Count I and with respect to liability under Counts II and III, with damages reserved for trial. (Doc. 42 at 2, 19). The defendant seeks summary judgment as to all three counts. The defendant also seeks a judgment declaring that the Award is valid, binding and enforceable and ordering the plaintiff to pay it. (Doc. 41 at 1, 6).

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id.*  "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Id.*; *accord United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 n.19 (11th Cir. 1991) (en banc).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party."  *Four Parcels*, 941 F.2d at 1438  (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made."  *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact."  *Fitzpatrick*, 2 F.3d at 1116.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted);

3

*see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2]  Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *accord Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014).  The Court accordingly limits its review to those arguments the parties have expressly advanced.[3]

## I.  Evidence.

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *accord WBY, Inc. v. City of Chamblee*, 15 F.4th 1242, 1258 (11th Cir. 2025).  "Therefore, the [non-movant's] version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the [movants] and not in tension with the [non-movant's] version." *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 Fed. Appx. 784 (11th Cir. 2016).

---

[2] "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record," and "[t]he court need consider only the cited materials ...."  Fed. R. Civ. P. 56(c)(1)(A), (3); *accord HRCC, Ltd. v. Hard Rock Cafe International (USA), Inc.*, 703 Fed. Appx. 814, 817 (11th Cir. 2017).

By way of example, the plaintiff has submitted the entirety of a 117-page deposition, (Doc. 42-3), but it cites to only a few brief excerpts.  Similarly, the plaintiff has submitted the 19-page report of its expert, (Doc. 42-13), but it cites to only a few sentences.  The Court has considered only the cited portions of these exhibits.  Both sides have made factual assertions unaccompanied by any citation to the record, and these have not been considered.

[3] The parties include in their briefing a substantial number of factual assertions that they fail to translate into any argument in support of summary judgment.  The Court declines to identify or develop any potential arguments on the parties' behalf.

In late October 2020, a toilet on the Property overflowed into the house. The defendant promptly inspected in November 2020 and issued payment in January 2021, for under $12,000. The defendant then received two repair estimates -- one for over $34,000 ("the Red Lane estimate") and the other for over $31,000 ("the Giles estimate"). The plaintiff, following re-inspection, issued a second check in July 2021, for over $6,000. The defendant sought additional payment and the plaintiff, following a second re-inspection, issued a third check in September 2021, for almost $14,000. The defendant again requested additional payment, and the plaintiff issued a fourth check in June 2022. In all, the four checks totaled $34,519.01. (Docs. 42-6, -7, -8, 47-4). The defendant had negotiated all of them by the end of June 2022. (Doc. 42-8).

Also in June 2022, the plaintiff wrote the defendant that these payments excluded damage claimed by the defendant to a kitchen countertop, a bathroom vanity countertop, exterior wall insulation, and plumbing, on the grounds its three inspections did not note any loss-related damage to these items. (Doc. 50-1). The plaintiff advised the defendant to contact the plaintiff if it had any additional claim or damage to present. (*Id*.). The plaintiff further stated that, "[b]ased on our evaluation, the undisputed amount of the covered loss is $37,565.69 and checks totaling $34,519.01 have been issued to you." (*Id*.).

In December 2022, the defendant obtained another estimate ("the Pruitt estimate"). (Doc. 1-19 at 2-26). The Pruitt estimate provided a repair cost figure of $88,464.23. (*Id.* at 25).

The Policy contains the following provision ("the Appraisal Provision"):

**F. Appraisal**
    If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice by made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their

5

differences to the umpire.  A decision agreed to by any two will set the amount of loss.

(Doc. 1-2 at 25).

In January 2023, a Washington, D.C. lawyer notified the plaintiff that his firm represented the defendant with regard to the claim for the Loss and advised that the firm had retained a company ("ATA") "to document and estimate damages."  (Doc. 47-1).  A claim representative responded that the file had been assigned to him "for continued claims handling."  (Doc. 47-2 at 2, 4).  He continued:  "At this time, we believe our estimate to be accurate and would return our insured's property to its pre loss condition. If you are not in agreement, we request that you provide ... documentation that you have that would support your stance."  (*Id*.).

Within two weeks thereafter, the defendant, through counsel, emailed the plaintiff a notice of claim and formal demand for payment.  (Doc. 47-3).  The letter stated that ATA had discovered extensive water damage to the property totaling $73,964.76 and demanded payment in this amount, minus the deductible.  (*Id*. at 2, 4).  The letter attached ATA's estimate.  (*Id*. at 2; Doc. 42-11).

On February 28, 2023, the lawyer emailed to the plaintiff an attached letter (dated November 2022) demanding an appraisal, on the grounds the plaintiff and defendant "have failed to reach an agreement on the amount of loss at issue.  As an element of this dispute, the parties disagree as to the actual cash value and replacement cost value of the covered repairs as determined by GeoVera."  (Doc. 1-3).  The demand included the defendant's naming of its appraiser and looked forward to the plaintiff's response and to working together to select an umpire.  (*Id*.).  Communications between the parties thereafter were through counsel.

The Policy contains the following provision:

### C.  Duties After Loss
...
In case of a loss to covered property, we have no duty to provide coverage under this policy if there is failure to comply with the following duties ...:
7.      As often as we reasonably require:

> ...
>
> c.      You or any "insured" under this policy must:
> (1) Submit to examinations under oath and recorded statements, while not in the presence of any other "insured" ....

(Doc. 1-2 at 53). A similar requirement applies to artificial entity insureds and to the insured's agents and representatives. (*Id*. at 53-54).

The plaintiff responded to the defendant's letter demanding an appraisal in early March 2023. It advised that, "[p]rior to agreeing to appraisal and that [sic] there is a dispute as to the amount of damage, GeoVera needs to further investigate the claim," including by taking the EUO of three individuals. (Doc. 1-4; *accord* Doc. 1-7). The parties had sporadic communications during 2023 about scheduling one or more EUO's, eventually agreeing on a late November date. (Docs. 1-8 to 1-12). In June 2023, the defendant identified Alabama counsel, (Doc. 1-9 at 1), and subsequent communications on behalf of the defendant came from and to him and/or his office

In early November 2023, the defendant asked the plaintiff to name its appraiser before scheduling an EUO. (Doc. 1-13). The plaintiff responded that it could not submit to appraisal without knowing what was to be appraised, because the plaintiff had paid the defendant's contractors' estimates and the plaintiff was under the impression the claim had been fully paid. (Doc. 1-14). The EUO did not occur as scheduled.

On December 27, 2023, the defendant advised the plaintiff that it was in breach of the Policy due to its failure to name an appraiser within 20 days after the defendant had named its appraiser. The defendant named a substitute appraiser (its original choice was no longer available), and it advised the plaintiff that it was "moving forward with requesting a court-appointed umpire" due to the plaintiff's asserted breach of the Appraisal Provision. (Doc. 1-15).

On the same date, the defendant emailed a letter to state Circuit Judge Clark Stankoski. By this letter, the defendant: quoted the Appraisal Provision in full; advised that the defendant had demanded appraisal over a year earlier; stated that the plaintiff had refused to select an appraiser; asserted that this failure entitled the defendant to request

7

judicial selection of the umpire; listed several potential candidates; and requested Judge Stankoski to appoint an umpire. (Doc. 1-16). The defendant did not inform Judge Stankoski that the plaintiff was represented by counsel. (Doc. 42-2 at 12).[4]

The defendant did not give the plaintiff notice of its letter to Judge Stankoski. (Doc. 42-2 at 12). The defendant emailed the plaintiff an "order" on or before January 2, 2024. (Doc. 1-17). That document has not been submitted, but the plaintiff asserts that it was actually a "letter" that appointed an umpire for appraisal. (Doc. 42 at 8).

The next day, the plaintiff filed a complaint for declaratory judgment in federal court. *Geovera Specialty Insurance Co. v. DNB Investments LLC*, Civil Action No. 24-0003-JB-M ("*Geovera*"). The plaintiff sought a declaration that it "has no obligation to participate in the appraisal as ordered by Judge Stankoski ... as [he] was not apprised of the actual nature of the dispute, or the parties involved therein at the time of the request for the order and the issuance of the order itself." *Geovera*, Doc. 1 at 8.

The defendant moved to dismiss the federal action for lack of the requisite amount in controversy. *Geovera*, Doc. 6. The defendant noted that, to demonstrate the amount in controversy, the plaintiff merely subtracted from Policy limits the amount it had paid and posited that the remainder (almost $160,000) was in controversy, *id*., Doc. 1 at 2, and the defendant correctly argued that this was legally insufficient to carry the plaintiff's burden of demonstrating the existence of diversity jurisdiction. *Id*., Doc. 7 at 1-2.[5] The

---

[4] The plaintiff served discovery requests, including requests for admission, on September 16, 2025. (Doc. 42-2). The plaintiff asserts that the defendant never responded to the requests for admission, (Doc. 42 at 3-4), and the defendant does not deny it. Nor has the defendant sought judicial relief from any obligation to respond to the requests. By operation of law, the defendant has therefore admitted the matter set forth in the requests for admission. Fed. R. Civ. P. 36(a)(3). The defendant has not sought relief from its deemed admission.

[5] *See, e.g., Associated Industries Insurance Co. v. Wilson's Pool Design, LLC*, 690 F. Supp. 3d 1338, 1346 (S.D. Ala. 2023) ("Equating policy limits with the amount in controversy in an action seeking rescission of a CGL policy is attractively simple, but it does not satisfy governing legal standards."); *Dees v. Coleman American Moving Services, Inc*., 2017 WL 4838845 at *3 (S.D. Ala. 2017) ("The limits of the plaintiffs' policy say little if anything about the value of their claim ... for the simple reason that the ... claim may be for far less than the policy limit.") (internal quotes omitted).

defendant then argued that the November 2022 letter "clearly states that the amount in controversy at issue is $73,964.76 less the deductible (and implicitly, prior payments)." *Id*. at 4.  On August 15, 2024, Judge Beaverstock granted the motion to dismiss, ruling that the plaintiff had not carried its burden of establishing by a preponderance of the evidence that the amount in controversy exceeded $75,000.  *Id*., Doc. 19.

Following this setback, the plaintiff named an appraiser.  (Doc. 1 at 8; Doc. 42 at 5).  The appraisers agreed on the Award, which was entered on November 11, 2024. (Doc. 1-19).  The amount awarded was $88,464.23.  (*Id*. at 1).  The Pruitt estimate in the same amount was attached to the Award.  (*Id*. at 2-26).

Repairs to the Property were commenced in October 2023 and were completed in February 2024.  (Doc. 42-3 at 13, 16).

## II.  Plaintiff's Motion.

As noted, the plaintiff in its motion seeks affirmative relief in the form of:  (1) a declaration that it has no obligation to pay the Award; and (2) a determination that the defendant is liable to the plaintiff for fraud and for statutory violations.  Because the plaintiff bears the burden of proof at trial, it bears the burden on motion for summary judgment of "support[ing] its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial."  *Four Parcels*, 941 F.2d at 1438.

### A.  Declaratory Judgment.

The plaintiff advances a number of arguments why it is not obligated to pay the Award.  The Court considers them in the order they fall in the appraisal process.

#### 1.  Prerequisites to appraisal.

The plaintiff presents four reasons it says the Appraisal Provision was never triggered:  (1) there was no claim or loss as to which the defendant could demand an appraisal; (2) the parties did not disagree as to the amount of loss; (3) the defendant's failure to submit to EUO precluded any duty to proceed to appraisal; and (4) the parties'

9

disagreement as to the scope of loss precluded any such duty.  The Court considers these assertions in turn.


### a.  No claim or loss.

The plaintiff argues that the claim on the Loss was "paid in full," and therefore "resolved," in June 2022.  (Doc. 42 at 12).  "Hence, when DNB made its demand for appraisal, there was no longer any loss about which to disagree."  (*Id*.).  The plaintiff relies solely on the opinion of its expert, (*id*. at 13), who states no such proposition.[6]  Nor does the plaintiff cite any case or other authority establishing when a claim is "resolved" so as to be incapable of supporting a demand for appraisal.

The plaintiff has not even established its premise that the claim was "paid in full," as its cumulative payments ($34,519.01) fell below the higher of the defendant's contractors' estimates ($35,592.86) minus the Policy deductible ($1,000).  (Doc. 42-6 at 18).  Moreover, the plaintiff itself recognized that the amount of the covered loss was $37,565.69, (Doc. 47-4 at 3; Doc. 50-1 at 1), and it fails to explain how a claim can be "paid in full" when the insurer admits that the amount of covered loss, minus the deductible, is several thousand dollars greater than what it paid.[7]


### b.  No disagreement regarding the amount of loss.

The appraisal process is implicated "[i]f you and we fail to agree on the amount of loss."  (Doc. 1-2 at 25).  The plaintiff asserts that the necessary disagreement is negated by its payments.  (Doc. 47 at 2).  As noted, however, the plaintiff in fact paid the

---

[6] The expert opines only that it would be "inconsistent with industry standards" to allow appraisal "where the insurer has already paid the insured's demanded amount."  (Doc. 42-13 at 15).  Even accepting this opinion at face value, the plaintiff has not shown that governing law draws the same line its expert would draw.  In any event, and as discussed in text, the evidence indicates the plaintiff never paid the defendant its entire demanded amount.

[7] Perhaps this could be so if, for example, the defendant executed a release in exchange for the payments it received, but the plaintiff produces no evidence, or even suggestion, of such an event.

defendant less than the higher of the defendant's estimates.  The plaintiff appears to assume there is some *de minimis* level of permissible underpayment, (*id.*), but it offers no authority for any such proposition.  Nor has the plaintiff explained why the Court should assume the defendant was uninterested in receiving the additional $2,000+ the plaintiff apparently declined to pay despite it being part of "the undisputed amount of the covered loss." (Doc. 50-1 at 1).

Moreover, the plaintiff notified the defendant in June 2022 of its "formal position" that the $34,519.01 was all the plaintiff would pay on the claim.  (Doc. 50-1 at 1, 5).  The defendant's subsequent demand for payment was accompanied by ATA's estimate exceeding $73,000.  (Doc. 47-3 at 2-4).  The plaintiff responded by stating that "we continue to believe our estimate to be accurate and would return our insured's property to its pre loss [sic] condition."  (Doc. 47-4 at 2).  The plaintiff continued that "[i]t is our position that the estimate submitted by ATA ... is overwritten," a position "based on the Geovera multiple inspections that confirm the scope of all of the damages," as well as the Red Lane and Giles estimates.  (*Id*. at 3).  The plaintiff does not explain how its explicit rejection of the amount of loss asserted by the defendant via the ATA estimate could fail to reflect a "fail[ure] to agree on the amount of loss."[8]  At a minimum, the defendant's statement in the November 2022 letter demanding appraisal that the parties disagree as to the value "of the covered repairs as determined by GeoVera," (Doc. 1-3 at 2), reflects a genuine dispute of fact as to whether the parties disagreed as to the amount of loss.

---

[8] In its reply brief, the plaintiff asserts that the ATA estimate reflects only an increased "scope of loss," not an increased "amount of loss." (Doc. 50 at 4).  As discussed in Part II.A.1.d, the argument comes too late to be considered, and the plaintiff appears to be wrong about the relationship between the two terms.  In any event, the plaintiff stresses that it paid almost all of the Red Lane estimate, so the Court must assume for present purposes that the plaintiff agrees with the scope of loss reflected in that estimate.  (The plaintiff failed to submit its own adjuster's estimate as an exhibit to its motion.)  It is plain from a comparison of the Red Lane estimate with the ATA estimate that the latter in many respects identifies the same elements of loss and simply presents a higher cost of remediating them.

11

### c. Failure to submit to EUO.

The plaintiff argues that the defendant's failure to submit to requested EUO's precludes its liability. (Doc. 42 at 13-15; Doc. 47 at 3-6). The Policy conditions the plaintiff's "duty to provide coverage" on the submission of the defendant, its agents and representatives to examination under oath "[a]s often as we reasonably require." (Doc. 1-2 at 53-54). Such a provision establishes as "a strict condition to [the insurer's] liability under the contract, that [the insured] submit to an examination under oath," and the insurer's "obligation to pay or to evaluate the validity of an insured's claim does not arise until" the insured has complied with such a condition. *Nationwide Insurance Co. v. Nilsen*, 745 So. 2d 264, 267 (Ala. 1998). An insured "must comply with [its] post-loss obligations [as] a precondition to any duty on the part of the insurer to make a loss payment," and, "absent the establishment of a duty to pay, there cannot be a genuine 'disagreement' between the parties as to the issue of the proper amount of payment." *Baldwin Mutual Insurance Co. v. Adair*, 181 So. 3d 1033, 1045 (Ala. 2014). "In other words, the insured must satisfy [its] post-loss obligations so that the insurer can know whether it does or does not agree with the insured's claim as to the amount of the loss at issue." *Id*. at 1046. These post-loss obligations include, as in *Adair*, "submi[ssion] to an examination under oath." *Id*. at 1044. The plaintiff invokes *Adair* and *Nilsen*.

It is undisputed that the plaintiff requested EUO's under the Policy and that the defendant never submitted to any. The defendant stresses that the Appraisal Provision does not expressly condition an appraisal on completion of an EUO, (Doc. 48 at 4; Doc. 49 at 3), which is correct but inconsequential under the *Adair* analysis (which the defendant ignores). In *Adair*, as here, the duty to submit to EUO was not found in the appraisal provision but in a separate provision titled, "Duties in the Event of Loss or Damage." 181 So. 3d at 1043-44. Because the defendant identifies, and the Court discerns, nothing in the Policy that could distinguish it from the policies at issue in *Adair*, the condition precedent in that case presumptively exists in this one.

In *Adair*, the insurer had made payment on the plaintiffs' claims and considered them settled. The insureds then sent the insurer a letter invoking the appraisal provision.

12

In response, the insurer filed an action in state court, seeking declaratory judgment and injunctive relief. When the trial court found the prerequisites to appraisal satisfied as to fourteen plaintiffs even though they had not submitted to EUO as requested, the insurer timely appealed, resulting in the Supreme Court's decision discussed above. 181 So. 3d at 1034, 1037, 1041, 1044. In this case, the plaintiff followed a much different route. When it learned of Judge Stankoski's letter/order naming an umpire, the plaintiff filed a declaratory judgment action in federal court, but when Judge Beaverstock dismissed that action for lack of subject matter jurisdiction, the plaintiff did not pursue similar relief in state court (which certainly had jurisdiction). For aught that appears, the plaintiff did not even informally request Judge Stankoski to rescind, limit, clarify, or stay his letter/order. Instead, the plaintiff simply proceeded to name an appraiser, which of course resulted in the appraisal that it now says should never have occurred.

There is no question but that an insurer may waive conditions in its policy. *Georgia Home Insurance Co. v. Allen*, 30 So. 537, 529 (Ala. 1901); *QBE Insurance Corp. v. Blount Medical Center Partners*, 2010 WL 11566124 at *7 (N.D. Ala. 2010) (waiver of proof-of-loss condition); *Simonetti v. Niagara Fire Insurance Co.*, 74 F. Supp. 726, 729 (N.D. Ala. 1947) (waiver of EUO condition). The defendant argues that the plaintiff waived any EUO condition to appraisal, as well as any other objection to proceeding with appraisal, by "participating in the appraisal through its chosen appraiser." (Doc. 41 at 5). The defendant also invokes estoppel and "acquiescence." (Doc. 48 at 7).

The defendant offers no authority supporting its position.[9] The plaintiff says it adequately and timely objected to any appraisal preceding EUO, and it cites communications from March and November 2023 that reflect its opposition to such sequencing. (Docs. 1-4, 1-7, 1-14). The plaintiff might also have cited its complaint in

---

[9] The defendant cites *Alfa Life Insurance Co. v. Johnson*, 822 So. 2d 400 (Ala. 2001), and *Rogers v. State Farm Fire and Casualty Co.*, 984 So. 2d 382 (2007). (Doc. 41 at 5; Doc. 48 at 5, 7). *Johnson* does not mention waiver or estoppel at all, and *Rogers* addresses waiver of appraisal, not waiver of objections to appraisal. 984 So. 2d at 386-88.

the prior federal lawsuit, which noted its objection to such sequencing and sought a judicial declaration that it owed no duty to participate in an appraisal until such time as it had information sufficient to determine whether there was a disagreement as to the amount of loss. *Geovera*, Doc. 1 at 3-4, 7.

The plaintiff's problem is that, once the federal action was dismissed, it proceeded to appraisal without, as far as the record discloses, further objection, a reservation of rights, or any other conditioning of its participation in the process. Although the complaint alleges that the dismissal left the plaintiff "with no further other and viable redress," (Doc. 1 at 8), the plaintiff does not so assert on motion for summary judgment, and with good reason: Judge Beaverstock did not reach or reject the plaintiff's position on the merits but dismissed the action purely on jurisdictional grounds, leaving the plaintiff free to pursue the exact same relief in state court, where jurisdiction unquestionably resided.

It seems clear that the plaintiff was not under any external compulsion to advance to appraisal. As the plaintiff admits, the defendant "did not ask the [state] judge to compel appraisal and appoint and [sic] umpire, it only asked him to appoint an umpire." (Doc. 47 at 6 (internal quotes omitted)). The evidence bears this out, (Doc. 1-16 at 2), and no party suggests that Judge Stankoski did more than what the defendant requested.[10] Even had he done so, the plaintiff retained the same recourse as the insurer exercised in *Adair*: filing a lawsuit in state court to enjoin appraisal. It thus appears that the plaintiff at all times remained free to resist appraisal.

According to its own assertions, the plaintiff elected to proceed with appraisal because it was satisfied, based on the defendant's position regarding the amount in controversy for federal jurisdictional purposes, that its maximum exposure (beyond payments already made) was approximately $38,445.75. The very basis of the plaintiff's fraud claim is that it was "induced to participate" in the appraisal by the defendant's

---

[10] As noted, the parties have not placed his letter/order in the record.

14

representation that the amount in controversy was $73,964.76, less the deductible and prior payments.  (Doc. 1 at 8, 10-11; Doc. 42 at 17).

Perhaps all this amounts to a waiver or an estoppel, perhaps not.  The parties have devoted too little ink and too little thought to the question to permit its definitive resolution at this time, and the Court declines to fill in the gaps on their behalf.

### d.  Scope of loss.

The plaintiff argues that the parties "were not in agreement as to the scope of loss when the appraisal was conducted.  Thus, the appraisal award is invalid and unenforceable."  (Doc. 50 at 2; *accord id*. at 5).  The plaintiff's argument is doomed from the outset.

"District courts, including this one, ordinarily do not consider arguments raised for the first time on reply."  *Parker v. Exterior Restorations, Inc*., 653 F. Supp. 3d 1105, 1108 (S.D. Ala. 2023).  "Unless the offending party articulates an adequate reason for its failure to present in its principal brief an argument then available to it, the Court will not grant relief based on arguments first raised in reply."  *Id*.[11]  Because the plaintiff offers no explanation for its failure to assert any "scope of loss" argument in its principal brief, it cannot obtain summary judgment based on the argument.

Even had the argument been timely raised, it would not support summary judgment.  The plaintiff relies exclusively on *Rogers v. State Farm Fire and Casualty Co*., 984 So. 2d 382 (Ala. 2007).  The *Rogers* Court "adopt[ed] ... as our rule of law" that "an appraiser's duty is limited to determining the 'amount of loss' -- the monetary value of the property damage -- and that appraisers are not vested with the authority to decide questions of coverage and liability."  *Id*. at 392.  The trial court in *Rogers* therefore erred

---

[11] The Court recognizes two exceptions to this rule, neither of which is in play:  when the argument implicates the Court's subject matter jurisdiction, and when the non-movant has anticipated the argument and addressed it in its opposition brief.  *E.g., Samuels v. Midland Funding, LLC*, 921 F. Supp. 2d 1321, 1333 n.20 (S.D. Ala. 2013); *Parker v. Exterior Restorations, Inc*., 2021 WL 6335336 at *4 n.6 (S.D. Ala. 2021); *Bank of Brewton v. Travelers Companies, Inc*., 2014 WL 2113092 at *4 (S.D. Ala. 2014).

15

in ordering the parties to submit to the appraisal process, because "they were not in agreement as to the cause of the damage to the brick veneer or to the foundation."  *Id*.

The plaintiff defines "scope of loss" as "the amount and type of damage that has been done to a structure."  (Doc. 50 at 2 (internal quotes omitted)).  According to the plaintiff, "[t]he 'scope of loss' defines what has been damaged and how to fix it, while the 'amount of loss' defines the monetary value or total cost of those repairs."  (*Id*.)  The plaintiff equates "scope of the loss" with "extent of the loss."  (*Id*. at 5).  The plaintiff concedes that the parties "agreed that the leak caused the loss, [but] they were not in agreement as to 'scope of the damages,' *i.e.*, what was and was not damaged by the occurrence."  (*Id*.).  According to the plaintiff, then, even when the parties agree that the loss resulted from a covered cause, an appraisal is impermissible unless the parties also agree, and agree perfectly, on:  what elements were damaged; the degree to which they were damaged; and how to remediate the damage.[12]

The *Rogers* Court did not use the term "scope of loss," and its opinion appears to be in tension with the plaintiff's position.  The Alabama Supreme Court quoted a Texas decision holding that, "'if the parties agree there is coverage but disagree on the extent of the damage, the dispute concerns the "amount of loss" and that issue is determined in accordance with the appraisal clause.'"  984 So. 2d at 391 (quoting *Johnson v. State Farm Lloyds*, 204 S.W.3d 897, 903 (Tex. App. 2006)).  A rule "'approach[ing] every disagreement on extent of damage as a causation, coverage or liability issue'" would allow a party to "'defeat the other party's request for appraisal by labeling a disagreement as a coverage dispute.'"  *Id*.

Sister courts have construed *Rogers* as "approvin[g]" this view.  *Haman, Inc. v. Chubb Custom Insurance Co*., 2021 WL 1208863 at *11 (N.D. Ala. 2021); *accord Cobblestone Condominium Association, Inc. v. Travelers Casualty Insurance Co*., 377 F.

---

[12] The plaintiff elsewhere contradicts its own position by insisting "that the *appraisers are required to ... evaluate the scope* and value *of the damage*."  (Doc. 47 at 13 (emphasis added).  The discussion in text assumes for argument that the plaintiff's concession does not of itself defeat its argument.

16

Supp. 3d 1291, 1304 (N.D. Ala. 2019); *Cole v. Owners Insurance Co.*, 326 F. Supp. 3d 1307, 1324-25 (N.D. Ala. 2018).  When the question is whether the damage to the foundation was caused by settlement (not covered) or tornado (covered), appraisers may not answer it.  *Rogers*, 984 So. 2d at 392.  When the question is whether damage to the roof, and consequent water damage to the interior, was caused by wind (covered) or age and poor maintenance (not covered), appraisers may not answer it.  *Haman*, 2021 WL 1208863 at *12.  But when  the parties agree that wind and/or hail (a covered cause) damaged at least some roofs in the insured's 26-building complex, and the only disagreement is over "the number of roofs impacted," "the parties dispute the extent of the loss, a dispute which an appraisal would resolve" because "questions about the extent of loss fit squarely within insurance appraisal provisions."  *Cobblestone*, 377 F. Supp. 3d at 1299, 1304, 1305.  And when the parties agree that fire caused a covered loss, differences of opinion regarding the "'scope of loss'" are disputes "about the extent of the damages," and "'[e]xtent of loss' disputes fall squarely within the insurance appraisal provisions."  *Cole*, 326 F. Supp. 3d at 1324.

Although these sister courts have persuasively argued that questions regarding the scope of loss are for the appraisers to answer, the Court need not, and does not, adopt their position, primarily because the parties have not addressed it.  For present purposes, it is enough to say that sister courts have so construed *Rogers* and that the plaintiff cannot prevail without explaining why the Court should not adopt the same view.

### 2.  Procedure for invoking appraisal.

The plaintiff argues that the defendant "failed to follow the Policy's procedure for appointment of an umpire," and that this of itself frees it of any obligation to pay the Award.  (Doc. 42 at 15-16).  The Policy anticipates that each side will select its appraiser and that the appraisers will select the umpire or, if they cannot agree, either party may request that a state judge make the selection.  (Doc. 1-2 at 25).  The defendant's failure, says the plaintiff, was that a necessary antecedent to seeking judicial appointment of an

17

umpire is the defendant's proposal of an umpire and the plaintiff's disagreement with the defendant's proposal -- events that never occurred. (Doc. 42 at 15-16).

The Policy does not in fact require the parties to propose an umpire; instead, it requires the appraisers to do so. The defendant named its appraiser, but the plaintiff declined to do likewise. The plaintiff does not suggest it has rightful power to derail an appraisal simply by failing to name an appraiser, and the Court will not indulge such an assumption absent an affirmative showing that such power exists. The defendant named its appraiser in February 2023, and the plaintiff still had not followed suit as of December 2023, a time lapse that swallows the 20 days the Appraisal Provision provided the plaintiff to name its appraiser and the 15 days it provided thereafter for the appraisers to name the umpire.

The plaintiff also argues that seeking appointment of an umpire via *ex parte* letter "is not delineated in the Policy" and runs contrary to "'industry expectations ... of candor and fairness.'" (Doc. 42 at 16 (quoting Doc. 42-13 at 16)). The Policy provides that "you or we may request that the choice be made by a [state] judge," (Doc. 1-2 at 25), language that suggests either party may on its own approach a state judge seeking such relief. Certainly the Policy appears capable of such a construction and, as the plaintiff acknowledges, (Doc. 42 at 11-12), ambiguous Policy provisions are to be construed against it. The plaintiff offers no legal authority for its position or even a parsing of the Appraisal Provision's language, and the insurance industry's expectations for how an insured should behave are no substitute for a Policy prohibition of such behavior.

Finally, and as noted, the defendant urges that the plaintiff has waived, or is otherwise precluded from relying on, all of its pre-appraisal objections, and the plaintiff has not meaningfully engaged with that objection.

### 3. Performance of appraisal.

The plaintiff objects that the appraisers did not "separately set the amount of loss" as contemplated by the Appraisal Provision. According to the plaintiff's expert, this clause "means that each appraiser was expected to independently evaluate the scope and

18

value of the damages." (Doc. 42-13 at 16). Instead, the plaintiff says, "the appraisal relied on an estimate based on information from 2022, rather than [the appraisers] developing a separate valuation at the time of the appraisal." (Doc. 42 at 16-17; Doc. 47 at 6-7, 12-13).

The appraisers' report reflects an agreed award of $88,464.23. (Doc. 1-19 at 1). Attached to the award is Pruitt's December 2022 estimate, and the amount awarded matches his estimate to the penny. (*Id*. at 25). The Court therefore assumes that the appraisers did not conduct two separate, fresh appraisals in November 2024. The plaintiff, however, fails to explain how it could have been otherwise. Repairs began in October 2023 (three years after the Loss) and concluded in February 2024, (Doc. 42-3 at 13, 16), so it would seem to have been impossible for the appraisers in November 2024 to create new valuations of the damage that had by then been remediated. Nor does it seem obviously insupportable, in such a situation, for the appraisers to agree to rely instead on a thorough estimate made by one who had observed the Property's pre-repair condition. Perhaps a reasoned, legally supported argument for nullifying an appraisal award under such circumstances could be constructed, but the plaintiff has not offered one.

The plaintiff does protest that it was not aware, until the date of the appraisal, that the repairs had already been accomplished. (Doc. 47 at 13). That may be unfortunate, but the plaintiff has neither articulated nor supported any argument that such a circumstance legally precludes the appraisers in such a situation from relying on a pre-repair estimate in reaching their conclusion.

Even if the appraisers' process was in some sense objectionable, the plaintiff has not shown that it can form a proper basis for resisting payment of the resulting Award. The defendant asserts that post-award challenges are limited to those generally recognized in the arbitration context, *viz*., fraud, corruption, and evident partiality. (Doc. 41 at 1, 4; Doc. 48 at 3, 6).[13] The old Fifth Circuit long ago surveyed Alabama cases and concluded that they "recogniz[e] the rule which we apply that every reasonable

---

[13] *See, e.g.*, Ala. Code § 6-6-14.

intendment and presumption is in favor of an award of appraisers selected to determine the value of property lost, and it will not be vacated unless it clearly appears that it was made without authority or was the result of fraud, or mistake or misfeasance of the appraisers." *In re: Waters*, 93 F.2d 196, 200 (5th Cir. 1937). Although the defendant in its briefing repeatedly emphasized the limited scope of post-award judicial review, the plaintiff ignored the argument. It did so at its peril.

### B. Fraud.

As the plaintiff acknowledges, (Doc. 42 at 18), "[t]he elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Brickhouse Capital, LLC v. Coastal Cryo AL, LLC*, 393 So. 3d 467, 473 (Ala. 2023) (internal quotes omitted).

Count II alleges that, in the previous federal lawsuit, the defendant "made material misrepresentations of fact" that "induced [the plaintiff] into participating in a sham appraisal." (Doc. 1 at 10-11). The alleged misrepresentation is the defendant's assertion in its brief supporting its motion to remand that the November 2022 letter "clearly states that the amount in controversy at issue is $73,964.76 less the deductible (and implicitly, prior payments)," *Geovera*, Doc. 7 at 4. (Doc. 42 at 2, 18).[14] The plaintiff claims that this representation was false because the defendant was then in possession of the Pruitt estimate, showing a repair cost exceeding $88,000. (*Id*. at 18).

There is no evidence that defense counsel was aware of the Pruitt estimate when the brief at issue was filed.[15] Nor is it clear that the brief contained any false statement, since it said only that the November 2022 letter reflected a certain amount in controversy.

---

[14] The plaintiff claims the statement was repeated at oral argument, (Doc. 42 at 18; Doc. 47 at 14), but it provides no evidence to support that assertion.

[15] The Pruitt estimate was obtained six months before Alabama counsel became associated with the file.

In any event, the plaintiff has presented no evidence that it reasonably relied to its detriment on the alleged misrepresentation. The plaintiff's briefs simply declare that the plaintiff "was induced to participate" in the appraisal and that, "but for the misrepresentation ..., Geovera would not have been forced to participate in an improperly invoked appraisal process." (Doc. 42 at 17; Doc. 47 at 14-15).

As discussed in Part II.A.1.c, it does not appear that the plaintiff was "forced" to participate in an appraisal. To begin with, the choice of verb appears to attempt an impermissible expansion of the complaint, which alleges only that the plaintiff was "induced" to participate. Even if the plaintiff were free to pursue this argument, no element of compulsion has been shown. As discussed in Part II.A.2, there is no evidence that Judge Stankoski ordered the plaintiff to proceed to appraisal, and there is no evidence that the plaintiff exhausted available means of resisting either the defendant's demands for an appraisal or (if it occurred) Judge Stankoski's ordering of an appraisal. The only apparent result of the alleged misrepresentation was the loss of a federal forum to challenge the defendant's insistence on an appraisal -- an action that plainly did not prevent the plaintiff from pursuing the same challenge in a state forum rather than submit to appraisal.

The plaintiff does not explain how the alleged misrepresentation as to the amount in controversy "induced" it to participate in an appraisal, and it points to no evidence that the representation actually played any role in its decision to abandon its resistance to an appraisal. The only discernible way the representation could have influenced the plaintiff's decision is if the plaintiff construed the representation as setting a cap on the amount of any appraisal award, with the plaintiff deciding it could live with such an award should it be made. Any such reliance would appear to be facially unreasonable. First, as far as the plaintiff could know, nothing would have prevented the defendant from obtaining an estimate higher than the ATA estimate after the alleged misrepresentation, or after dismissal of the federal action. Second, even absent an estimate higher than ATA's estimate, nothing would have prevented the appraisers from making an award higher than that estimate.

21

The plaintiff's briefing on fraud asserts or suggests additional misrepresentations and/or non-disclosures by the defendant. (Doc. 42 at 18; Doc. 47 at 14). Because the plaintiff develops no argument as to the significance of these alleged circumstances, they present nothing for the Court to consider. The Court pauses only to note that the complaint explicitly limits the fraud claim to the alleged misrepresentation regarding the amount in controversy, (Doc. 1 at 10-11), and a complaint can be expanded only by amendment, not by brief.[16]

### C. Alabama Litigation Accountability Act.

Count III is based on the same alleged in-court misrepresentation made the subject of the plaintiff's fraud claim. The complaint alleges that the plaintiff was damaged by the defendant's representation as to the amount in controversy in two ways: (1) it deprived the plaintiff of the opportunity to have its pre-appraisal challenges heard in federal court; and (2) it compelled the plaintiff to submit to a sham appraisal. (Doc. 1 at 11-12).

Other than declaring that it seeks summary judgment as to its claim under the Act, (Doc. 42 at 2, 11), the plaintiff ignores Count III in its briefing. Without even identifying the essential elements of a claim under the Act, much less explaining how it has established each such element legally and factually, the plaintiff cannot obtain summary judgment.[17]

---

[16] *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *accord Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329, 1336 n.6 (11th Cir. 2021) (plaintiff could not by brief expand her retaliation claim by identifying an additional protected activity for which she was retaliated against); *Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) (plaintiff could not by brief inject a new theory of supervisory liability); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 705-06 (11th Cir. 20216) (plaintiff could not by brief expand his defamation claim by identifying additional allegedly false statements).

[17] Count III appears to depend on the premise that the defendant's representation regarding the amount in controversy was the critical foundation of Judge Beaverstock's jurisdictional decision, and the plaintiff in brief expressly asserts that his decision was "[b]ased upon" the representation. (Doc. 42 at 18; Doc. 47 at 14). This is plainly incorrect. What Judge Beaverstock ruled was that the demand letter referenced by counsel placed approximately

### III.  Defendant's Motion.

The Court has considered the defendant's modest briefing in analyzing the plaintiff's motion for partial summary judgment.  While that briefing lends some support to the Court's denial of the plaintiff's motion, it fails to demonstrate that the plaintiff's mirror-image motion is due to be granted, for reasons that appear in the Court's previous discussion.[18]

### CONCLUSION

For the reasons set forth above, the plaintiff's motion for partial summary judgment is **denied**, and the defendant's motion for summary judgment is likewise **denied**.[19]

DONE and ORDERED this 30th day of March, 2026.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

$40,000 in controversy and that the defendant's alleged threat to seek damages for bad faith could not be considered absent an actual, pending bad faith claim.  *Geovera*, Doc. 19 at 5-6. Dismissal thus would still have been required even had the defendant represented the amount in controversy to be the approximately $54,000 the plaintiff says is reflected by the Pruitt estimate.

[18] For example, although the reasonableness of any reliance by the plaintiff on the defendant's representation as to the amount in controversy in the previous federal proceeding appears quite suspect, the defendant in its motion fails even to address that element of the plaintiff's fraud claim and so cannot achieve summary judgment as to that claim.

[19] The plaintiff's motion for leave to supplement its response to the defendant's motion, (Doc. 51), is **denied**, as the defendant's motion is due to be denied without consideration of the plaintiff's supplemental response proffered in support of such denial.